W. A. SCHOLL v. STATE

No. 24884. November 29, 1950.
Rehearing Denied January 31, 1951.
Second Motion for Rehearing Denied February 14, 1951.
Order of Supreme Court of United States, Denying Writ of
Certiorari, filed October 7, 1951.

Hon. J. R. Fuchs, Judge Presiding.

*Dibrell, Gardner & Dotson,* San Antonio, for appellant.

*Elbert R. Jandt,* Seguin, amicus curiae.

*George P. Blackburn,* State's Attorney, Austin, for the state.

GRAVES, Presiding Judge.

Appellant was convicted for accepting a bribe, and given a sentence of two years in the state penitentiary.

Appellant was the sheriff of Comal County in the year 1947. During that year one, Elbert O. Smith, Sr., was indicted by the grand jury of Comal County for cattle theft. Appellant was a witness for the state, and as such, he was properly subpoenaed in the case. Prior to the time of this trial, appellant was defeated for the office of sheriff, while the case against Smith was still pending in the district court of that county. Thereafter, certain conversations took place between appellant and Smith, as well as between Smith and one, King, who was a

deputy sheriff under appellant while he was sheriff. The burden of these conversations was that if Smith desired to beat his case of cattle theft, he was going at it in the wrong way; that there was no use in paying a large lawyer's fee and then probably losing the case; that if Smith would give appellant the sum of $3,000.00, appellant would then leave Comal County and go to Canada and not appear against Smith at the time of the trial. Negotiations continued for some time, most of the talk being with Mr. King at his place of business. Eventually Smith talked this matter over with a neighbor and friend at San Antonio, where Smith lived, and this friend and Smith finally contacted one, Duncan, who owned and operated an industrial agency known as Texas Industry Surveys, which seemed to have been a private detective service, and at Mr. Duncan's suggestion, certain precautions were taken in the matter as follows:

Mr. Smith, having finally gotten the price of appellant's absence from his trial set at $2,500.00, he borrowed $2,000.00 of that amount from a bank, his wife furnishing $500.00 thereof, and in the presence of others, Duncan took this large amount of money and divided it into twenties, tens, fives and ones, and stamped the bills with an invisible ink, and also taking the number of the bills. Wearing rubber gloves, he then rubbed zinc sulphite, a certain chemical substance, on these bills, especially heavy on the twenty-dollar bills, and he then wrapped these bills up and put them in a paper sack, giving Smith instructions not to place his hands on these bills or in the sack.

All of these matters were told to the officers and to the sheriff's department of Comal County, who were cognizant thereof.

Appointments were made by Smith with King and also the appellant, advising them of the final securing of the $2,500.00, and the contemplated trip to New Braunfels to deliver the same. On one of such trips, the appellant failed to show up at King's office and no transfer was made. On the succeeding night, after a telephone call was made by appellant to Smith, the parties met in front of King's office; and certain officers saw appellant get into the car of Smith, and they saw Smith hand a package to appellant similar to the one prepared by them and containing the $2,500.00. Appellant then placed this package on the seat of Smith's car and started for his home on West San Antonio Street in New Braunfels. Smith and others followed

appellant, who drove up to his home, the officers remaining behind Smith, and appellant got out of his car and came to the car of Smith and took the package supposed to contain the $2,500.00 and went into his (appellant's) home.

The sheriff, accompanied by other officers, attempted to arrest appellant at such time, but appellant resisted and demanded that they procure a warrant for his arrest. Leaving appellant, the sheriff went to the court house and finally obtained a warrant of arrest, and in about thirty minutes he again appeared at appellant's home and took him into custody. They then took appellant to the court house and by the application of a violet ray light, they found many places on his body and clothing that glowed with a greenish light. It was shown by the testimony that wherever this zinc sulphite was touched it would leave a substance that would glow with a greenish light under a violet ray. Eventually, about an hour and a half after the attempted arrest of appellant, the sheriff obtained a search warrant and searched the appellant's home. No money was found therein. However, two of appellant's sons, under the violet ray light, glowed "like lightning bugs", but no further person reacted to the violet ray. The record is silent in regard to what became of the money.

Appellant admitted that Smith appeared at King's office on the night in question and testified relative to such meeting as follows:

"I say when I got in the automobile of E. O. Smith, Sr., he put $2,500 in my lap. I picked it up and told him — he told me he wanted to go ahead and give it to me, because I had gone ahead and been nice to him and his boys while they were confined in jail. I told him that he didn't owe me anything.

"He was in jail sometime in December, 1947, and this was April 16, 1949, and he said he wanted me to have the money because I had been nice to him in 1947.

"I got in my automobile and left. When I got home, I drove about one-third up in the driveway. When the car pulled up, it stopped in front of my house. When the car stopped in front of my house, I stopped. I wasn't watching for anybody. I happened to see the automobile, because the light was on; the car pulled right up in front of my residence. I presumed there was someone that wanted to see me, or someone that was coming up there. I stopped my car, got out, and walked up to the car. It was E. O. Smith, Sr., the same man that I had talked to down

here, the same man whom I had told I didn't want any of his money. He again wanted me to take the $2,500. He wanted to go ahead and give me $2,500. I told him that I didn't want any of his money. I told him good night, and got out, and walked up to my car. I walked up around to the front of my house to the steps, turned left and got in my car. The car may have been running. I left the lights on. I got in my car and drove back around the house. I went ahead and parked the car."

Appellant testified further as follows:

"I never before had $2,500 dumped in my lap that somebody asked me to take. When I came home, I did not tell anybody about it. It never had happened before, and I did not tell anybody about it; still, it was the first time that it ever happened that a man had put $2,500 in my lap to give to me because I had been good to him, and I said that I wouldn't take it.

"He didn't put it in my lap the second time. I didn't even see the money when I got in his car the second time. He still wanted to give it to me. I told him I didn't want his money. I did not see the money, though. He said he still wanted me to have that money. I told him I didn't want the money."

The testimony is present that the watching officers saw appellant with the paper sack when he was in the car of Smith in front of King's office, but did not see the claimed transfer at appellant's home when he approached Smith's car at such place. However, they did immediately search Smith's car, as well as his person, and did not find the money package, this being done soon after appellant had left the car and gone into his residence.

We find it impossible to write on all the bills of exception found in the record, but will attempt to write on what we think to be the main questions presented in the oral argument hereof, as well as the briefs.

Appellant contends that Smith was an accomplice as a matter of law and that the trial court should have so instructed the jury. It is here worthy of note that the trial court did submit the question of Smith's accompliceship to the jury and instructed them on the law relative thereto, in the event they found him to be such accomplice. The complaint is that under the facts as shown, Smith was such accomplice, and the court should have so instructed the jury. Unquestionably, the witness furnished the money to be paid appellant for his absence in the

future trial and was present when the alleged acceptance was had, according to the state's testimony. The question then becomes paramount as to what was the purpose of Smith in furnishing this money. According to the testimony of the state, appellant was the person who initiated the conversations relative to the alleged bribe. King and appellant, as co-conspirators, continued the conversations relative to this transaction, they demanding $3,000.00 for appellant's absence, and finally agreeing to the sum of $2,500.00 as such price. During all these negotiations, Smith made a confidant of the officers as well as of Duncan, the man to whom the officers sent Smith; and the telephone conversations with King, as well as with appellant, were had and a record thereof played in court before the jury. At these conversations there were others listening in, and by means of a recording instrument, the whole conversations were heard by the jury. In the negotiations, Smith, with the package of money, made a trip to New Braunfels and contacted King, but appellant failed to show up on April 15, 1949, and although Smith appeared as well as the many people who had been notified by him, he returned to San Antonio without having contacted the appellant. On the following day (April 16, 1949) appellant called Smith over the telephone at San Antonio and made an appointment to see him around 6:00 o'clock P.M., at New Braunfels, and about 8:00 o'clock appellant had another telephone conversation with Smith, who was in front of King's office in New Braunfels at such time; and pursuant thereto, appellant soon drove up in front of King's office and near Smith's car. After getting in Smith's car, the appellant's version of such conversation is as follows:

" 'Well, how are you getting along?' he said.

" 'All right,' I said.

" 'Doc,' he says, 'I haven't got much time. I have been waiting here. I want to get back to San Antonio; I am in a hurry to get back, but I have always wanted to do something for you. You treated me and my boys nice while we were in your jail, and I have got some money. I want to go ahead and give you a present of $2,500.' He took the money and throwed it into my lap."

"I don't know where he got the money. When I saw it, he had it in his hand. I did not see a sack nor a rubber band. I was sitting next to the man. It happened at night time. The lights were not on in the car, and my car was parked directly in front of Mr. Smith's car at that particular time. He put the money into my lap. I was sitting there; he threw it into my lap. He said it

was money; I don't know whether it was or not. I couldn't make out what it was; it was a bundle, looked like money. I don't know whether it was money or not; I couldn't make out what it was. I did not count it there. I picked it up and put it aside on the seat. I was sitting on the right-hand side. I was not behind the driver's seat; Mr. Smith was behind the driver's seat."

" 'Mr. Smith, I appreciate your going ahead and trying to give me some money,' I said; 'You don't owe me anything. I don't want any money,' I says, 'for treating your boys nice and you nicely while I had you in custody. I treated everybody decent that I had in custody. I don't want anything; you just keep the money."

"He said, 'You go ahead and take it.'

"I said, 'No.' I got out of the automobile and told him, 'I'm sorry.' I didn't want anything. 'I was going home,' and left."

Again, appellant testified:

"I got back into my car and drove home like I generally drive, 25 or 30 miles an hour, maybe sometimes 20, just ordinary speed.

"When I got to my home, I drove up to the house in the yard, into the yard part of the way. I noticed that a car pulled up to the curb in front of my residence. I stopped my car and got out. I don't believe I killed my motor; I don't recall whether I turned the lights off or not; I don't think I did. I think I left the lights burning. I am not sure whether I did or did not.

"I walked up to the car that was parked in front with its lights burning. I recognized the car as Mr. Smith's car.

"I just opened the door, and he said, 'Come in and sit down. I want to talk to you a minute.' He says, 'I still want you to have this. I want to give this to you as a friend.'

" 'No, Mr. Smith, you don't owe me anything. I don't want anything,' I said. 'I have people up here at the house. Good night.' And I got out of the car and left, walked up to my car, started my automobile, drove it around to the back, in the back of my glassed-in porch, and parked it, and walked into the house."

The burden of a large portion of this testimony relates to the preparation of certain other testimony relative to the purpose of preparing the money and for its future identification,

as well as to reports to the officers at San Antonio and at New Braunfels, and a completion of plans for the detection of a criminal offense.

In order to find Smith to have acted in the matter as an accomplice as a matter of law, it is worthy of note as to whether he could have been convicted of any offense herein under the proven facts.

Did he have any real intention to actually give any certain sum of money to appellant in return for appellant absenting himself from Smith's trial? Smith's immediate and continued contact with the officers in both counties should have weight in determining what his attitude was relative to this bribe, whether accepted or not. There was no secrecy relative to the whole matter, but he seemed to be in full co-operation with such officers and under their watchful eye at all times. Under the circumstances, we are of the opinion that the trial court was correct in submitting this matter of accompliceship to the jury. All the proven conduct of Smith shows that he did not initiate the proposition relative to the absence of the appellant; and immediately after having received the invitation to enter into this agreement, all his actions were in compliance with the suggestions and advice of the officers. His intent was to punish for a violation of the law, not to cause such violation. His actions were known to many persons and not animated by an intent to violate the statute.

We are cited to the case of Dever v. State, 37 Tex. Cr. R. 396, 30 S.W. 1071. In that case the accomplice took part in the conspiracy with which the accused was charged and actually assisted in carrying out a portion of the conspiracy, but eventually becoming alarmed, he communicated with the officers. It should be borne in mind that the accused in that case was charged with a conspiracy to rob a train, which robbery was not carried out, but as to such conspiracy, Mayfield was held to be an accomplice. Other cited cases are not in point. As sustaining our proposition herein, we refer to Hyde v. State, 73 Tex. Cr. R. 452, 165 S.W. 195; Holmes v. State, 70 Tex. Cr. R. 214, 156 S.W. 1172.

It is often the better practice to allow the jury to pass upon the accompliceship of a witness whenever there seems to be some question relative thereto.

It is evident from the subpoena introduced herein that same

was executed by the appellant (sheriff at that time) upon others, as well as himself, after an application therefor had been properly made. The subpoena was served by appellant on three other witnesses and himself on May 6, 1948, in the case of E. O. Smith, Sr., No. 1895, in the district court of Comal County. We see no reason why a sheriff could not serve himself in a subpoena. The statute merely prescribes that "a subpoena is served by reading the same in the hearing of the witness." Art. 464, Vernon's Ann. C.C.P. There were three further witnesses subpoenaed by the same subpoena, and the appellant certified in his return that he executed the same "by reading this subpoena in the presence and hearing of each of the within named witnesses at the following times and places: W. A. Scholl, May 6, 1948, 1:30 P.M., New Braunfels, North"; also the three remaining witnesses the same as above. We hold that the subpoena shows the proper service upon appellant of a subpoena by himself. To hold otherwise would deprive a sheriff who had no deputy of legally bringing himself into court as a witness.

It is contended that the witnesses who helped prepare the money for future identification knew the purpose of the use of such money and were accomplices as a matter of law. They had no contacts with appellant and acted only for the purpose of being able to identify this sum of money at a future time regardless of in whose possession these bills might be found. See Hyde v. State, supra; also 18 Tex. Jur. p. 260, sec. 158, and cases there cited.

Appellant's attorney, in his argument before this court, relied mostly upon three propositions for a reversal hereof, as well as suggested others, the main suggestion being that the trial court erred in allowing the record to contain certain conversations by Smith with other parties wherein he finally decided to obtain the sum of $2,500.00, and what preparations were made for the purpose of passing the same to the appellant. That this testimony was outside the presence of appellant, there can be no doubt; and also that same was material is also plainly evident. However, it was necessarily a part of the acts and evidence of the motive of Smith without which he would have been an accomplice as a matter of law. In this instance, the state surely would have admitted such had there been no evidence of the good faith of Smith, and such testimony would bear heavily upon Smith's motive in preparing to and actually offering this sum of money. Evidently the jury, in their deliberations upon whether or not Smith was an accomplice, as submitted to them by the court, could utilize Smith's acts relative

to this bribe in determining the issue of his accompliceship and in determining his motives therein.

The record herein is voluminous, the transcript containing 374 pages with 10 requested charges, as well as many motions and 63 bills of exception, and the statement of facts consisting of 555 pages.

It is evident that it would be practically impossible to write herein on each bill found in the record. However, we have gone over them and have noticed the main propositions presented; but all bills not written upon are deemed to be without merit.

Finding no error in the record, the judgment will be affirmed.

ON APPELLANT'S MOTION FOR REHEARING.

BEAUCHAMP, Judge.

Appellant has filed a motion for rehearing, together with an extensive brief on several of the questions considered in the original opinion. The most impressive of these complain of the evidence as to conversations between the prosecuting witness Smith and other parties with whom he advised during the time that he says negotiations were pending, as originated by the appellant, who sought a bribe for the purpose of relieving Smith of Scholl's testimony in the trial of a case pending against Smith for cattle theft.

We believe that the original opinion expresses our view very clearly. We recognize the force of the argument in appellant's motion and also that found in the brief amicus curiae, filed by permission of the court, by the Honorable Elbert R. Jandt of Seguin, Texas, whose client has an interest in the outcome of this prosecution.

According to the state's testimony, Smith was first approached by Scholl and by King, his former deputy, who were acting together in the matter. The admissibility of the evidence turns upon the duty which the witness Smith had in the matter to act immediately when approached about it. He did this by conferring with friends and officers, for the purpose of keeping himself within the provisions of the law and at the same time bring one to justice who was planning a violation of the law so seriously affecting the processes of the courts. In order to protect himself as a witness and to secure his own safety against

charges in the matter, he sought the assistance of the proper officers. From that time forward he was acting under their advice and direction. There is no evidence of anything which he did to constitute him an accomplice. It became necessary for him to prove such facts—not for the purpose of going to the guilt of the accused, but for the purpose of protecting himself as an individual and preserving his evidence to be admissible before the court in the trial of the prosecution of Scholl. His conduct in doing so should be approved instead of branding him as an accomplice.

Great care and caution should be used by the trial judge to prevent the introduction of hearsay matters not pertinent to the very limited purpose for which they are admissible, that is for the protection of the witness so as to prevent his being charged with giving a bribe, or attempting to give a bribe. It is about the only way a witness, under such circumstances, could be secure in giving aid of this nature to the officers in the enforcement of the law. Such evidence could not be made a vehicle for the purpose of developing the details of the facts, as against the party on trial, but should be looked to for the protection of the prosecuting witness. Appellant might have asked for an instruction to limit the purpose and consideration to be given the evidence. The only objection lodged against this evidence by the bills, or any of them, is sufficiently met by the holding which we wish to make clear that so much of the conversation which he had with the officers, and others, relative to the matter as will show his motives in the matter of giving a bribe is admissible. The evidence in this case does not violate such restriction and was properly admitted.

To write further on the several questions raised could serve only to extend the discussion in the original opinion, which we believe leads to the proper conclusion.

Appellant's motion for rehearing is overruled.